**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JAMES C. BRANYON, JR., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHOENIX BUSINESS CONSULTING, | ) | 1:16CV673 |
| INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff James C. Branyon, Jr. has sued his former employer, Defendant

Phoenix Business Consulting, Inc. ("Phoenix"), for violations of the North Carolina

Wage and Hour Act ("Wage and Hour Act") and seeks to recover, among other

relief, commissions he believes he is owed under three purported contracts – the

First Anvil Contract, the Second Anvil Contract, and the Grain Craft Contract.

(See, e.g., Compl. ¶¶ 21-35 [Doc. #2].)  This matter is before the Court on

Phoenix's Motion for Summary Judgment [Doc. #40].  Phoenix argues that the

Wage and Hour Act claim fails as a matter of law because the claims for

commissions under the Anvil Contracts are barred by the statute of limitations, the

claim under the Second Anvil Contract is not supported by the allegations in the

Complaint, and the claims under all Contracts are unsubstantiated by competent

evidence. (See Mot. for Summ. J. at 1-2; see also Mem. of Law in Supp. of Def.'s

Mot. for Summ. J. [Docs. #41, 45 (Sealed)].)  For the reasons that follow,

Phoenix's Motion is granted in part and denied in part.  It is denied in part as to the

portion of the Wage and Hour Act claim seeking commissions due on May 27, 2014 onward under the Second Anvil Contract for services provided by Kim Swartz. It is otherwise granted.

I.

Branyon was a sales associate with Phoenix from late 2005 or early 2006, when Phoenix merged with Branyon's previous employer, until his termination on December 31, 2015. (James C. Branyon, Jr. Dep. 14:22-25, 25:1-3 (May 2, 2017) [Doc. #42-1]; Richard Michael Very, Jr. Dep. 135:18-22 (May 3, 2017) [Doc. #42-2].)[1] Phoenix, also doing business as Thorondor, provides Business Planning and Control System ("BPCS") software consulting and technical services. (Very Dep. 29:18-19, 171:2-4.) As a sales associate for Phoenix, Branyon's primary duty was to secure contracts for Phoenix's services by contacting prospective and current clients to purchase Phoenix's software and consulting services. (Branyon Dep. 25:9-14.) He would do so by identifying and creating demand for Phoenix's services and developing relationships with customers. (Id. at 25:23-25.) If he were selling software, he "identif[ied], . . . qualif[ied,] and then once the sale's made, . . . turn[ed] it over and mov[ed] on to the next sale." (Id. at 26:8-12.) On the other hand, if he were selling services, "it's much more of a

_____

[1] Phoenix and Branyon both submitted portions of Branyon's and Very's Depositions in support of their respective arguments. (See Docs. #42-1 (Excerpts of Branyon Dep. submitted by Phoenix), #48-1 (Excerpts of Branyon Dep. submitted by Branyon); Docs. #42-2 (Excerpts of Very Dep. submitted by Phoenix), #49-1 (Excerpts of Very Dep. submitted by Branyon).) For judicial economy, only one source is cited in instances in which a cited excerpt can be found in more than one of these sources.

relationship sale" so he would "spend more time -- . . . constantly maintaining the customers." (Id. at 26:4-7.)  This included "phone calls [and] visits". (Id. at 26:13-18.)  Richard Very of Phoenix similarly described Branyon as the "interface between the client and Phoenix to help maintain the customer support at a high level[,] [t]o identify any new opportunities with that client[,] [t]o effectively seal the deal on those new opportunities when he – when he could[, and] [t]o continuously search for other new opportunities." (Very Dep. 48:14-19.)  A "big portion of his responsibility" "was maintaining client relationships with those clients that were assigned to him." (Id. at 48:22-25.)

Effective January 1, 2009, Branyon operated under a compensation plan ("2009 Compensation Plan"), according to which the parties agreed he would receive a commission of nine percent of Phoenix's gross sales for accounts assigned to him. (Branyon Dep. 44:2-20, 46:7-18; Very Dep. 79:3-9, 94:8-18; Ex. 3 to Branyon Dep. [Docs. #42-3, #48-3].)  The 2009 Compensation Plan reads, in part, "9% Commissions on All Work @ $135/hour or higher up to $2.5 Sales". (Ex. 3 to Branyon Dep.)

In 2010, Anvil International, LP ("Anvil"), a BPCS services client of Phoenix, decided to transition to new software, prompting Phoenix to undertake efforts to sell Anvil its new software. (Branyon Dep. 28:14-25.)  After Phoenix successfully did so, it bid on the project to implement the software at Anvil's facilities by offering consulting services. (Id. at 30:15-19; 160:20-163:9.)  Ultimately, as a result of at least the work of Branyon, Anvil and Thorondor entered into a Master

3

Services Agreement ("MSA") on October 3, 2011, according to which Thorondor

would provide services, either directly or through third parties, to Anvil as directed

in separately executed Services Work Authorizations ("SWAs"). (Very Dep. 88:4-5,

88:19-23, 89:18-24; Ex. 4 to Very Dep. [Docs. #42-4, 49-2 (Sealed)].)  Attached

to the MSA was the initial SWA. (Ex. 4 to Very Dep.)  This account was assigned

to Branyon. (Very Dep. 88:14-17.)

Nine days after the MSA was executed, on October 12, 2011, Very emailed

Branyon on the subject of "Anvil Commissions". (Ex. 5 to Branyon Dep. [Docs.

#42-5, 48-5].)  The email reads, in relevant part,

> Jim – just to sum up what we discussed this morning:
> . . .
>
> Ongoing Services Commission on services provided by Thorondor
> resources:
> * Jim – 9%
> . . .
>
> Ongoing Services Commission on services provided by other than
> Thorondor resources – We need to discuss, but we would suggest the
> commission be based on NET Profit Margin to Thorondor (if any).
> These should be minimal.
>
> . . . ".

(Id.) Branyon did not agree to the distinction between commissions paid on

services provided by Phoenix and those provided by subcontractors. (Branyon Dep.

74:3-20; Very Dep. 95:11-13.)

In February 2013, a subcontractor, Kim Swartz, began servicing Anvil under

the MSA. (Branyon Dep. 82:18-83:25; Very Dep. 161:13-16.) On October 1,

2013, Branyon emailed Very the following:

Rich

Per our discussions attached is a copy of the compensation that I
understand we are operating under.

Based on this plan I have the following current concerns:
Commissions for billings to Anvil do not appear to include services
subcontracted by PHOENIX to other companies including Infor.

Commissions for billings to Anvil for Kim Swartz to [sic] not appear to
match the terms of this plan[.]

I request that we address and resolve these issues.

(Ex. 6 to Branyon Dep.) Branyon was being paid nine percent of Swartz's

net sales. (Very Dep. 94:19-22.) Very responded to Branyon's email as

follows:

Jim – you and I discussed your commission to [sic] based on our net
from Anvil as we DID NOT HAVE to subcontract. We would not have
subcontracted to lose money.

Do you want commissions on the net or no subcontracting?

Your choice.

Rich V

(Ex. 6 to Branyon Dep.) Although Branyon does not recall an e-mail

response to Very, his overall response remained the same – disagreement

that he was to be paid commission on net sales by subcontractors. (Branyon Dep. 76:11-20; Very 95:11-13.)

On May 27, 2016, Branyon filed suit against Phoenix alleging that it violated the North Carolina Wage and Hour Act by failing to pay him commissions earned under the 2009 Compensation Plan "related to the First Anvil Contract, the Second Anvil Contract, and the Grain Craft Contract." (Compl. ¶ 55.) Branyon seeks commissions owed during his term of employment, as well as those he believes are due from services provided under the MSA after his termination.

II.

North Carolina recognizes commissions as wages that are protected under the Wage and Hour Act and related regulations promulgated by the North Carolina Department of Labor. See N.C. Gen. Stat. § 95-25.2 (defining "wages" to mean commissions), 13 N.C.A.C. 12.0307(a) (permitting employers to pay wages as commissions). As a result, an employer must "notify employees of the employer['s] policies and practices concerning pay, [and] wages based on . . . commissions . . .", 13 N.C.A.C. 12.0307(b), and ambiguous policies and practices are "construed against the employer and in favor of employees," 13 N.C.A.C. 12.0307(c). Policies and practices relating to commissions must address how and when the commissions are earned so that the employee knows the commissions to which he is entitled. 13 N.C.A.C. 12.0307(d)(1).

Employers may modify wages, but they must "[n]otify employees, in writing . . ., at least 24 hours prior to any changes in promised wages." N.C. Gen. Stat. § 95-25.13(3). However, "[w]ages computed under a . . . commission . . . policy or practice which does not establish specific earning criteria [such as a policy that the employee earn commissions of xx% on all 'sales' (where sales are not defined by the employer)] cannot be reduced or eliminated as a result of a change in policy or practice." 13 N.C.A.C. 12.0307(e). On the other hand, if the commission policy or practice establishes a specific earning criteria, "the employee is entitled to the . . . commission . . . earned under the original policy through the effective date of the change and is entitled to the . . . commission . . . earned under the new policy from the effective date forward, so long as the earning criteria are met under both policies." Id.

The employer's policy or practice relating to commissions must address "[u]nder what conditions and in what amount . . . commissions . . . will be paid upon discontinuation of employment." 13 N.C.A.C. 12.0307(d)(2). An employee "whose employment is discontinued for any reason shall be paid all wages due". N.C. Gen. Stat. § 95-25.7. "Wages based on . . . commissions . . . shall be paid on the first regular payday after the amount becomes calculable when a separation occurs." Id. § 95-25.7. "Such wages may not be forfeited unless the employee has been notified in accordance with G.S. 95-25.13 of the employer's policy or practice which

results in forfeiture." Id. If the employee is "not so notified", he is "not subject to such loss or forfeiture." Id.

III.

Phoenix first moves for summary judgment on Branyon's claim of commissions owed under the First Anvil Contract because there is no competent evidence of a "First Anvil Contract" and, even if there were, any claim under it would be barred by the statute of limitations. Branyon does not respond to Phoenix's statute of limitations defense and, by failing to do so, concedes the issue. See Oliver v. Baity, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016). In addition, analysis of Phoenix's limitations defense proves it to be correct.

According to the Complaint, Branyon "secured a contract between Anvil and Defendant under which Defendant would provide Anvil services at the rate of $180.00 per hour (the 'First Anvil Contract')", but Phoenix did not list this contract on Branyon's commission statement because Very claimed the margins were too low. (Compl. ¶¶ 21, 22.) During his deposition, Branyon explained that "First Anvil Contract" refers to services provided to Anvil during the early part of the software implementation process, but that "[a]t this point, I don't even know what they are. I've never seen them." (Branyon Dep. 62:9-63:4.) He clarified that "[t]here's not a contract – set contract between any of the companies, but there were services provided that were never commissioned." (Id. at 65:9-20.) His

belief that services were provided comes from speaking with two individuals

and other consultants "on site", although Branyon does not know if they

were working under the particular SWA according to which services were

being provided. (Id. at 63:18-64:12.) "There would have been discussions

with Rich [Very] [from which Branyon] would have also gleaned that

information." (Id. at 64:24-65:5.) Branyon testified that these services

would have been provided "[s]ometime beginning in 2011" and that he

"[p]robably first started to realize it in 2012, '13 time frame." (Id. at 64:3-6,

70:6-10.)

"Summary judgment is appropriate when, viewing the facts in the

light most favorable to the nonmoving party, 'there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of

law,' Fed. R. Civ. P. 56(a)." Groves v. Commc'n Workers of Am., 815 F.3d

177, 181 (4th Cir. 2016). The moving party bears the initial burden of

establishing "the basis for its motion[] and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[2]). The "mere existence of

some alleged factual dispute between the parties will not defeat an

---

[2] Rule 56(c) was amended effective December 1, 2010, but the substance of the rule did not change.

otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). A dispute is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. <u>Id.</u> at 248. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. <u>Id.</u>

Actions under the Wage and Hour Act must be brought within two years of the employer's failure to pay the earned wage. N.C. Gen. Stat. § 95-25.22(f). The 2009 Compensation Plan states that Branyon's "[c]ommissions [are] [e]arned after client payment received and [p]aid at next Commission Payment Cycle". (Ex. 3 to Branyon Dep.) Fees for services under the SWAs were to be invoiced weekly and were payable forty days after receipt of the invoice. (MSA Ex. 4 to Very Dep.) Once the invoice is paid, Phoenix would calculate Branyon's commission and include it in the "very next payment cycle" "which is a month." (Very Dep. 187:23-188:2.) As a result, the statute of limitations for a claim of commissions due would begin to run approximately seventy-seven days after the services were rendered. According to Branyon, the services under the First Anvil Contract for which he alleges he is owed commissions were provided in 2011; yet, he filed the instant action on May 27, 2016, well after the statute of limitations period. As a result, Phoenix's motion for summary judgment on the claim for commissions owed under the First Anvil Contract is granted.

10

IV.

Next, Phoenix moves for summary judgment on the claim for

commissions owed under the Second Anvil Contract because there is no

competent evidence in support of the claim and, even if there were, the

claim is barred by the statute of limitations and not supported by the

allegations in the Complaint.

A.

As above, Branyon does not respond to Phoenix's statute of

limitations defense and has, therefore, conceded the issue.[3] Analysis of the

issue also shows that Branyon's claim for commissions owed under the

Second Anvil Contract is partially time-barred.

In his Complaint, Branyon alleges that "Anvil later executed another

contract with Defendant (the 'Second Anvil Contract') according to which

the billing rate exceeded $180.00 per hour." (Compl. ¶ 26.) Allegedly,

Phoenix refused to pay Branyon commission "on the total sales" because the

margins were too low. (Id.) At his deposition, Branyon testified that the

Second Anvil Contract refers to supply chain services provided by Kim

Swartz for the entire Anvil project. (Branyon Dep. 82:22-83:12.) He

explained that Swartz's work began in February 2013, the same time frame

---

[3] In his Response Brief, he appears to concede the issue, as well, when he
attaches his commission statements "showing [Swartz's] sales under the MSA and
the commissions Defendant actually paid Branyon on her sales between May 27,
2014 and January 2016". (Resp. in Opp'n at 7 (emphasis added).)

during which he initially discussed with Very, Sean Kissane, and Becky Hall

commissions he believed were owed under this Second Anvil Contract. (Id.

83:7-19.)  Swartz continued servicing Anvil under the MSA at least until

January 2016. (See Phoenix Quick Reports (Ex. 7 to Resp. in Opp'n) [Doc.

#49-3 (Sealed)].)  For the reasons explained above, supra § III, Branyon's

claim for commissions due before May 27, 2014 for services provided by

Swartz is barred by the statute of limitations.

For commissions due from May 27, 2014 onward for services

provided by Swartz, Phoenix argues that it has paid Branyon in accordance

with "his 2009 Comp Plan, as modified in 2011." (Mem. of Law in Supp. of

Def.'s Mot. for Summ. J. at 21.)  Yet, there are genuine disputes of material

facts surrounding this proposition.  For example, there are genuine disputes

as to (1) whether the October 12, 2011 email noting the "need to discuss"

commissions paid for third-party services and "suggest[ing]" commissions

based on net profit margins suffices as written notice of a change in

promised wages in order to modify the 2009 Comp Plan, (2) whether the

October 12, 2011 email effectively changed Phoenix's policy on

commissions, (3) whether Branyon earned his commissions on Swartz's

services at the time the MSA was executed, when Anvil was invoiced, when

Phoenix received payment from Anvil, or some other time, and (4) whether

Branyon is entitled to commissions on services Swartz provided under the

MSA after the date of Branyon's termination. (See, e.g., 2009 Comp Plan;

12

Email from Very to Branyon (Oct. 12, 2011); Emails Between Very and Branyon (Oct. 1, 2013); Branyon Dep. 26:13-35:8 (describing work performed after the execution of an MSA), 46:11-49:9 (explaining payments for services after termination), 52:22-54:22 (explaining the assignment of accounts once a sale is made), 72:23-74:20 (discussing the October 12, 2011 email and possible related discussions), 165:11-167:13 (explaining the sale of the project as a whole); Very Dep. 88:14-89:5 (agreeing that Branyon was expecting commissions based on the sale of the MSA assigned to him), 90:2-20 (explaining that no services had been provided under the MSA prior to the October 12, 2011 email), 94:14-25 (discussing commissions paid on net revenue), 153:3-155:13 (explaining the development of SWAs), 187:12-188:11 (describing the 2009 Comp Plan and Phoenix's understanding of when Branyon earned commissions); MSA § 1.)

Therefore, Phoenix's motion for summary judgment on the claim for commissions owed under the Second Anvil Contract is granted to the extent Branyon seeks commissions due before May 27, 2014 for Swartz's services, but denied to the extent he seeks commissions due on May 27, 2014 onward for her services.

B.

Phoenix also challenges any argument that Branyon makes of entitlement to commissions for services provided to Anvil after his

13

termination by all third parties, not just Swartz. Phoenix's primary

contention is that Branyon did not allege entitlement to these commissions

in his Complaint and first raised the claim in a Motion to Compel Discovery

filed on the last day of the discovery period. (Mem. of Law in Supp. of

Def.'s Mot. for Summ. J. at 26-27.) Branyon does not address this

challenge, but does advance an argument in support of entitlement to these

commissions. (See Resp. in Opp'n at 8, 19 & Ex. 8 to Resp. in Opp'n.)

However, he is not permitted to assert this new claim in his brief in

opposition to summary judgment.

In his Complaint, Branyon specifically alleges that he was owed

commissions for services provided under the First and Second Anvil

Contracts. (Compl. ¶¶ 20-29.) He also alleges that the 2009 Comp Plan

does not require him to forfeit commissions upon termination. (Id. ¶ 54.) At

his deposition, he explained that the services under the First Anvil Contract

for which he seeks commissions were performed in 2011. (Branyon Dep.

64:3-5.) He further explained that his reference to the Second Anvil

Contract is for services Swartz began providing in February 2013. (Id. at

82:18-83:25.) The only allegation in his Complaint that can be construed as

a claim for commissions for services provided by consultants other than

Swartz after his termination is his general allegation that, "Upon information

and belief, and subject to discovery in this action, Defendant owes wages to

Plaintiff in addition to the commissions discussed herein." (Compl. ¶ 56.)

Had Branyon discovered evidence in support of a claim for

commissions on services provided by others after his termination, he needed

to seek leave to amend his Complaint. "[I]t is well established that a

plaintiff may not raise new claims after discovery has begun without

amending his complaint." United States ex rel. Owens v. First Kuwaiti Gen.

Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010); see also

Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009)

(stating the same); Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555

F.3d 324, 336 (4th Cir. 2009) (stating the same); Barclay White Skanska,

Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563-64 (4th Cir. 2008)

(unpublished) (distinguishing between claims for money owed that were

encompassed in the complaint's allegations and those that were not).

It is not enough that Branyon specifically alleged commissions due

under the First and Second Anvil Contracts and the Grain Craft Contract and

then alleged more generally that, upon information and belief and subject to

discovery, he is owed additional wages. A plaintiff may not "use that

general language to bootstrap new specific allegations and a new claim into

the complaint at summary judgment." Hexion Specialty Chems., Inc. v. Oak-

Bark Corp., No. 7:09-CV-105-D, 2011 WL 4527382, at *9 (E.D.N.C. Sept.

28, 2011) (refusing to consider the new claim presented in summary

judgment brief); see also Hawke v. Discovery Commc'ns, LLC, No. PX 17-

542, 2017 WL 2964127, at *2 (D. Md. July 12, 2017) (limiting analysis on

summary judgment to three specific allegedly defamatory statements in the complaint even though the complaint "also vaguely reference[d] 'other similar type statements'").  This is because "constructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant." Harris v. Reston Hosp. Ctr., LLC, 523 F. App'x 938, 946 (4th Cir. 2013) (unpublished) (affirming the district court's refusal to consider the plaintiff's new argument because she did not request leave to amend her pleadings, leaving the defendant to conduct discovery and a defense based on the claim in the complaint, "placing a clear burden on [the defendant's] ability to effectively and efficiently defend itself").

Here, Branyon did not seek leave to amend his Complaint to add a claim for commissions on services performed for Anvil after his termination by consultants other than Swartz.  He may not now use his brief in opposition to Phoenix's motion for summary judgment to assert such a claim.

V.

Phoenix also seeks summary judgment on Branyon's claim for commissions on services provided under the Grain Craft Contract because Branyon cannot provide legally competent evidence to support the essential elements of the claim. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 27-28.)  He testified during his deposition that he assumed Phoenix had

secured a contract with Grain Craft but admitted that he did not know that to be the case. (Branyon Dep. 95:8-17.)  In his Response Brief, Branyon acknowledges that based on a September 8, 2015 email from Very, he believed there were sales to Grain Craft for which he was not paid. (Resp. in Opp'n at 8.)  However, "[i]n Discovery, . . . it became apparent that there were no additional sales". (Id.)  Therefore, it appears that Branyon concedes that he is not due commissions under an alleged Grain Craft Contract. Summary judgment is granted on the wages claim based on that contract.

VI.

Finally, Phoenix seeks attorney's fees pursuant to N.C. Gen. Stat. § 95-25.22(d) which provides that "[t]he court may order . . . reasonable attorneys' fees to be paid by the plaintiff if the court determines that the action was frivolous." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 28-29.)  Phoenix argues that Branyon's Wage and Hour Act claim is frivolous because (1) not only are commissions under the First Anvil Contract time-barred, but Branyon admitted that the claim is based on assumptions, (2) Branyon was made aware in September 2015 that there was no Grain Craft Contract, and (3) clear legal authority contradicts Branyon's arguments in support of commissions under the Second Anvil Contract. (Id.)  The Court does not find Branyon's Wage and Hour Claim, a portion of which survives summary judgment, to be frivolous.  Accordingly, Phoenix's request for attorney's fees is denied.

VII.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendant

Phoenix Business Consulting, Inc.'s Motion for Summary Judgment [Doc.

#40] is DENIED IN PART AND GRANTED IN PART.  It is denied in part as to

the portion of the Wage and Hour Act claim seeking commissions due on

May 27, 2014 onward under the Second Anvil Contract for services

provided by Kim Swartz.  It is otherwise granted.

This the 5th day of March, 2018.


                                        /s/ N. Carlton Tilley, Jr.
                                        Senior United States District Judge